**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**DENNIS KARTY, SR.,**

      **Plaintiff,**

vs.                                                           No. CV 04-1373 LCS

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Plaintiff's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing (Doc. 11), filed May 13, 2005. The Commissioner of Social Security issued a final decision denying Plaintiff's application for supplemental security income. This matter comes before this Court pursuant to 28 U.S.C. § 636(c). The United States Magistrate Judge, having meticulously considered the Motion, briefs, administrative record, and applicable law, finds that this Motion is well-taken and should be **GRANTED** and this case is REMANDED to the Commissioner of Social Security for further proceedings consistent with this Memorandum Opinion and Order.

      **I.**      **STANDARD OF REVIEW**

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). "Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied

by such relevant evidence as a reasonable mind might accept to support the conclusion." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988) (quotation marks and citations omitted). The decision of an Administrative Law Judge ("A.L.J.") is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *Id.* at 805 (citation omitted).

In order to qualify for disability insurance benefits or supplemental security income, "a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of [at least] twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)). The Secretary has established a five step process for evaluating a disability claim. *Bowen v. Yuckert*, 482 U.S. 137, 137 (1987). At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpart P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988). At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *See Gatson v. Bowen*, 838 F.2d 442, 448-449 (10th Cir. 1988).

## II.     PROCEDURAL HISTORY

Plaintiff, now fifty-two years old, submitted a claim for Supplemental Security Income

payments on April 23, 1998 and an application for Social Security Disability Insurance benefits on April 29, 1998. (R. at 12.) Plaintiff alleged his disability began on October 24, 1997 due to a lower back injury and hand tingling and numbness. (*Id.*) Plaintiff has a ninth-grade education and has worked as both a home health caregiver and a laborer prior to the alleged onset of his disability. (R. at 72.)

The Social Security Administration denied Plaintiff's claims for Social Security and Supplemental Security Income disability benefits at the initial level on September 14, 1998 (R. at 25-31) and at the reconsideration level on November 23, 1998. (R. at 34-37.) Plaintiff appealed the denial of his application by filing a Request for Hearing by Administrative Law Judge. (R. at 38-39.) Plaintiff retained Representatives Gary J. Martone and A. Michelle Baca-K. on September 22, 1998. (R. at 24.) Plaintiff and Donald T. Morgan, a friend, testified at the hearing. (R. at 206-26.)

The A.L.J. issued his decision on February 11, 2000, analyzing Plaintiff's claim in accordance with the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f). (R. at 9-22.) At step one of the sequential evaluation, the A.L.J. found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability in 1997. (R. at 13.) At step two, the A.L.J. found that Plaintiff's low back syndrome and bilateral hand tingling and numbness were "severe" within the meaning of 20 C.F.R. §§ 404.1421 and 416.921. (*Id.*) The A.L.J. determined, however, that Plaintiff's overall condition had not met or equaled in severity any disorder described in the Listing of Impairments, Appendix I, Subpart P, 20 C.F.R. §§ 401.1501-1599. (R. at 13-14.) The A.L.J. also found that although a psychologist diagnosed Plaintiff with

dysthymia[1] in December, 1999, there was no evidence to support a conclusion that the impairment was "severe" as defined by 20 C.F.R. § 404.1521. (R. at 14.) The A.L.J. further concluded that Plaintiff's allegations regarding his limitations were not fully credible. (R. at 18.) At step four, the A.L.J. determined that Plaintiff had a Residual Functional Capacity ("RFC") for the full range of medium work and that Plaintiff's low back injury and bilateral hand tingling and numbness would not prevent him from performing his past relevant work. (*Id.*) Accordingly, the A.L.J. concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time through the date of the decision. (*Id.*)

Plaintiff filed a Request for Review of Hearing Decision by the Appeals Council on April 7, 2000. (R. at 8, 198-204-A.) The Appeals Council denied this request for review on August 3, 2001, thereby making the decision of the A.L.J. the final decision of the Commissioner for purposes of judicial review. (R. at 5-7.) On August 31, 2001, Plaintiff filed a Complaint seeking judicial review of the decision of the Commissioner denying his claim for Social Security benefits. (R. at 347-48.) On April 17, 2002, this Court granted the Parties' Agreed Motion to Reverse and Remand pursuant to Sentence Four. (R. at 349.) After reviewing the record, the Appeals Council, on June 6, 2002, vacated the final decision of the Commissioner and remanded the case to an A.L.J. for further evaluation and review. (R. at 351-352.) Plaintiff testified at a February 11, 2003 hearing (R. at 258-81), and Plaintiff and Zalla Galya, a vocational expert, testified at an August 13, 2003 supplemental hearing. (R. at 282-301.)

---

[1]Dysthymic disorder is characterized by a "[d]epressed mood for most of the day, for more days than not, as indicated either by subjective account or observation by others, for at least 2 years." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 380 (4th ed. Text Revision 2000) [hereinafter DSM-IV-TR].

The A.L.J. issued his Decision Upon Remand by the District Court on October 1, 2003, analyzing Plaintiff's claim in accordance with the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f). (R. at 241-53.) At step one, the A.L.J. found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability in 1997. (R. at 246.) At step two, the A.L.J. found that while Plaintiff's physical impairments were "severe," neither the physical nor the mental impairments were severe enough to meet or medically equal the criteria of the Listing Impairments, Appendix I, Subpart P, 20 C.F.R. §§ 401.1501-1599. (*Id.*) The A.L.J. also questioned Plaintiff's overall credibility in the case. (R. at 247.) At step four, the A.L.J. determined that Plaintiff had an RFC for a limited range of light work and could not perform his past relevant work because the its physical demands were beyond his RFC. (R. at 250.) At step five, the A.L.J. concluded that Plaintiff was capable of making a successful adjustment to work existing in significant numbers in the national economy. (R. at 251.) Accordingly, the A.L.J. determined that Plaintiff was not disabled at any time through the date of the decision. (*Id.*)

Plaintiff filed a Request for Review of Hearing Decision by Appeals Council and the Appeals Council declined to take jurisdiction on November 17, 2004. (R. at 227-30.) Hence, the A.L.J.'s October 1, 2003 decision became the final decision of the Commissioner of Social Security after remand by the Court. On December 8, 2004, Plaintiff filed this Complaint seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Doc. 1.)

### III.   ANALYSIS AND FINDINGS

Plaintiff has a history of lower back pain dating back to 1995, and has repeatedly sought treatment for numbness in his hands. (R. at 245.) Plaintiff has also been diagnosed at various

times with dysthymia, mild mental retardation,[2] alcohol abuse (by history) (R. at 165), a substance related disorder, borderline intellectual functioning,[3] and learning disorders. (R. at 446.) Through his almost monthly visits to the Public Health Service Albuquerque Indian Hospital ("PHS") over the past nine years, Plaintiff obtained prescriptions and numerous refills for several different pain medications and muscle relaxers for his hands and back including Motrin[4] (R. at 126, 135), Naproxen[5] (R. at 130, 394), and Robaxin[6] (R. at 133, 423). After the first A.L.J.'s unfavorable decision in February of 2000, Plaintiff also received a prescription and refills for Zoloft.[7] (R. at 196, 414.)

Treatment records from PHS show that Plaintiff has continuously been seen for lower back pain and hand tingling and numbness since at least 1996. (R. at 136-37.) Plaintiff was

---

[2]Individuals diagnosed with mild mental retardation "have minimal impairment in sensorimotor areas, . . . can acquire academic skills up to approximately the sixth grade level[,]" and "usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress." DSM-IV-TR, *supra* note 1, at 43.

[3]Borderline intellectual functioning involves an IQ range of 71-84. *Id.* at 48. "Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information." *Id.*

[4]"For the temporary relief of . . . muscular aches . . . ." MED. ECON. CO., PHYSICIANS' DESK REFERENCE 1683 (54th Ed. 2000) [hereinafter PDR].

[5]"Naproxen is a nonsteroidal anti-inflammatory drug (NSAID) with analgesic and antipyretic properties." *Id.* at 2631.

[6]"Robaxin (methocarbamol) is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions." *Id.* at 2606.

[7]"Zoloft (sertraline hydrochloride) is indicated for the treatment of depression." *Id.* at 2400.

prescribed hand splints in August, 1996, but it is unclear whether he was diagnosed with carpal tunnel syndrome at that time. (R. at 135.) From February 13 through March 5, 1998, Plaintiff attended University Hospital Rehabilitation Services for chronic re-injury of his lower back. (R. at 95-99.) Although the physical therapist employed electrical stimulation and recommended a very gentle stretching program, exercise on a recumbent bike, proper lifting techniques, walking, and ice, she reported that Plaintiff refused therapy and self discharged. (*Id.*) In August, 1998, Plaintiff underwent a renal ultrasound for chronic flank pain of three years. (R. at 138.) Good corticomedullary distinction was present, there was no evidence for hydronephrosis or shadowing renal stones, and the ultrasound was unremarkable. (*Id.*)

Gwen Y. Sun, M.D. performed a consultative examination and evaluation on August 24, 1998. (R. at 100-07.) Dr. Sun reported Plaintiff's chief complaints as low back pain and tingling, pain, and numbness of all ten fingers. (R. at 100.) Plaintiff stated that the pain in his back rated about a seven to eight on a scale of one to ten. (*Id.*) He described earlier injuries to his back from an exercising accident and from a 1970s stabbing incident. (*Id.*) Plaintiff also discussed a possible carpal tunnel syndrome diagnosis and mentioned that the pain in his hands had "been gradually coming on for the last two to three years." (*Id.*) Dr. Sun noted that Plaintiff "denies having past psychiatric conditions or drug abuse issues"; but Plaintiff also admitted to a history of alcohol abuse for over thirty years, although he said he had been sober for five years. (R. at 100-01.) Dr. Sun described Plaintiff as having an intact mental status, "including cognitive function, short-term, and long-term memory. He [did] not have a depressed nor flat affect." (R. at 101.)

Upon physical examination, Dr. Sun noted that Plaintiff walked with a normal gait, had a supple neck without lymphadenopathy, and had a neurological examination within normal limits.

(R. at 101-02.) A back examination showed a "positive straight leg raising at 45 degrees on the left greater than the right. However, the patellar deep tendon reflexes [were] symmetrical and 2+ with enhancement. His Achilles reflexes [were] 1+ and symmetrical with enhancement." (R. at 102.) His back had a full range of motion and Dr. Sun found no bony abnormality. (*Id.*) Plaintiff's "lower calf measurements [were] symmetrical with no sign of atrophy noted." (*Id.*) Dr. Sun could detect neither joint inflammation nor muscular atrophy throughout the musculoskeletal examination. (*Id.*) A radiographic study of Plaintiff's lumbar spine revealed hyperlordosis and a "slight space narrowing of the L5-S1 level." (*Id.*) The foramen were patent and the x-ray revealed minimal degenerative changes. (*Id.*)

Dr. Sun diagnosed Plaintiff with low back pain, but said that the condition was stable. (*Id.*) Aside from "a positive straight leg raise sign with pain reflected to the back" there were no signs of radiculopathy or back pain. (*Id.*) Dr. Sun attributed Plaintiff's hand tingling and numbness to an extensive history of alcohol abuse, but suggested that Plaintiff rule out the onset of diabetes. (*Id.*) The summary concluded that Plaintiff had no physical limitations. (*Id.*)

Based on Dr. Sun's evaluation, Melvin L. Golish, M.D. made findings on September 9, 1998 for a Physical Residual Functional Capacity Assessment. (R. at 108-15.) Under the "exertional limitations" section, Dr. Golish found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for a total of about six hours in an eight hour workday, sit with normal breaks for a total of about six hours in an eight hour workday, and push and/or pull a limited amount in his lower extremities subject to pain. (R. at 109.) Dr. Golish found occasional postural limitations secondary to Plaintiff's chronic low back pain. (R. at 110.) While Dr. Golish considered Plaintiff's hand

tingling and periodic numbness, he noted that no loss of strength or range of motion was exhibited and therefore did not report any manipulative limitations. (R. at 111.) No visual, communicative, or environmental limitations were reported. (R. at 111-12.) Philip J. Ferris, M.D. reviewed and agreed with Dr. Golish's RFC. (R. at 115.)

On June 21, 1999, Plaintiff and a friend, Mr. Donald Morgan, testified at an oral hearing before A.L.J. Richard J. Smith. (R. at 205-26.) Based on discrepancies between testimony obtained during the hearing and results obtained from Dr. Sun's 1998 evaluation, A.L.J. Smith ordered two additional consultative examinations. (R. at 54, 59.)

On September 24, 1999, Eugene P. Toner, M.D. recorded the results of a consultative orthopedic examination and evaluation. (R. at 154-61.) Plaintiff presented with mid and right-side lower back pain that he had experienced since a 1995 exercising injury. (R. at 154.) He said the pain was constant, at a seven to eight on a scale of one to ten, and radiated into his legs; he further claimed the pain had not improved after years of physical therapy and medication. (*Id.*) He stated that while the pain was always present, it changed in nature and was "worse with certain types of sitting, but not worse with any particular activity." (*Id.*) Plaintiff also complained that for the past three years his hands had been in pain, falling asleep, and tingling, and said that the condition might be due to carpal tunnel. (*Id.*) Plaintiff's daily activities at the time of the evaluation were reading, watching TV, eating out once in a while, and lying down six to seven times a day, but the physician was unable to ascertain the total amount of time spent lying down each day. (R. at 155.) Plaintiff said that he could lift but not carry a gallon of milk, bend down intermittently, and drive for approximately an hour. (*Id.*)

Dr. Toner noted that Plaintiff was well-developed, well-nourished, and well-muscled with a

9

normal gait. (*Id.*) The physician also observed "a high degree of complaints . . . of pain during the examination, especially while lying supine and . . . pronated." (*Id.*) The doctor noticed Plaintiff moved his neck very slowly, though Plaintiff stated that prior neck injuries were not giving him any problems during the evaluation. (R. at 156.) He had cervical rotation of 45 degrees bilaterally, lateral flexion of 20 degrees bilaterally, forward flexion of 20 degrees, extension of 10 degrees, and thoracic rotation of 5 degrees, right and left. (*Id.*) While the Plaintiff had full adduction, flexion, and extension, they "were also done slowly, with complaints of back pain, as [were] internal and external rotation." (*Id.*) Plaintiff's elbows and wrists had full range of motion, his hands had "3/5 grip, pinch and oppositional strength, and there [was] only a 3/5 strength to the shoulder girdles, with the claimant bending forward at the waist when his arms [were] pushed down . . . ." (*Id.*) There was no evidence of thenar atrophy, nor of paresthesia to light touch "as far as any dermatomal or nerve distribution paresthesia. The deep tendon reflexes [were] trace positive in the upper extremities." (*Id.*) Plaintiff's "range of motion of his hips was done with a fair amount of difficulty. . . . Extension was 10 degrees on the right and 15 degrees on the left." (*Id.*) Internal and external rotation were at "10 degrees bilaterally, with significant complaints of pain . . . . Abduction and adduction . . . were done with a normal amount of movement." (*Id.*) Plaintiff had full range of motion in his knees, but he would only dorsiflex his ankles 5 degrees and plantar flex his ankles zero degrees with complaints of back pain. (*Id.*) Dr. Toner saw no evidence of deformities or atrophy. (*Id.*)

Plaintiff exhibited positive Waddell's signs[8] because of the significant complaints of pain

---

[8] Waddell's signs are physical "indicators of a non-organic or psychological component to pain." Many patients exhibit one or two signs, but the presence of three or more signs is "positively correlated with high scores for depression[,] hysteria[,] and hypochondriasis . . . ."

"with axial compression of his spine and rotation of his spine. The lumbar range of motion was forward flexion of 30 degrees, extension of zero degrees, right and left lateral flexion of 15 degrees[,]" however, Plaintiff "would sit up with his legs extended to 90 degrees . . . ." (*Id.*) Dr. Toner was unable to palpate lumbar spasms. (R. at 157.) The assessments included "[c]omplaints of lower back pain, with significant symptom magnification" and "[c]omplaints of paresthesias of his hands, possibly secondary to hyperventilation and hysteria." (*Id.*) The physician remarked that Plaintiff's pain complaints were "far in excess of any objective findings." (*Id.*) Dr. Toner did not find anything to limit lifting, walking, standing, carrying, or using Plaintiff's hands, nor could he find any classical signs of carpal tunnel syndrome. (*Id.*) He noted that it was interesting that Plaintiff was very well muscled, yet would generate no strength and gave inconsistencies on what he was able to do. (*Id.*) For example, when Plaintiff was "lying prone, [he] used his elbows to support himself, . . . and yet he would not extend while standing." (*Id.*) Dr. Toner again stated that Plaintiff's Waddell's signs were very high, and concluded that Plaintiff would not need his activities restricted in any way, nor did he think Plaintiff's condition would worsen within a year. (*Id.*)

Plaintiff also consulted Richard P. Reed, Ph.D. for a psychological evaluation in December, 1999. (R. at 162-67.) Dr. Reed recorded that, as a child, Plaintiff frequently changed cities and schools, had surgery to correct the fact that he was tongue tied, had a problem with his

---

Waddell's signs include: superficial tenderness, nonanatomic tenderness, axial loading, pain on simulated rotation, distracted straight leg raise, regional sensory change, regional weakness, and overreaction. "Although Waddell's signs can detect a non-organic component to pain, they do not exclude an organic cause." Waddell's Signs, http://encyclopedia.thefreedictionary.com/Waddell's+signs (last visited Aug. 29, 2005). The A.L.J. in this case did not mention whether Plaintiff exhibited three or more Waddell's signs in any of his examinations.

eyes crossing, and attended special education classes throughout school before he quit school in the ninth grade. (R. at 162.) Plaintiff began drinking as a teenager and became an alcoholic, although he was not drinking at the time of the interview. (R. at 163.) Plaintiff reported that he could "'read simple things, but not hard words, and [could not] spell very well.'" (*Id.*) Dr. Reed described Plaintiff as oriented, pleasant, and cooperative, but Plaintiff also exhibited self-pity at times and reported feelings of depression and problems sleeping. (*Id.*) Plaintiff would frequently move around the room and change chairs, citing back pain. (*Id.*) He had "no problems with fluency or expressive or receptive difficulties using language. . . . His attention and concentration . . . ranged from fair to good." (*Id.*) Dr. Reed noticed no signs of an anxiety, major thought, or mood disorders, but Plaintiff did appear mildly depressed. (*Id.*) From the interview itself, he appeared to have overall intellectual functioning in the low average to average range. (*Id.*)

Dr. Reed administered the Wechsler Adult Intelligence Scale ("WAIS-III"). (*Id.*) Plaintiff was cooperative but gave up easily on difficult tasks. (R. at 163-64.) His three IQ scores – a verbal IQ of 61, a performance IQ of 65, and a full scale IQ of 60 – were all at or below the first percentile level and placed "him within the extremely low classification of intelligence . . . ." (R. at 164.) The test revealed that Plaintiff had "difficulty in all index areas, as well as in general verbal and performance intellectual abilities." (*Id.*) The scores were lower than Dr. Reed expected because of observations made during the interview, and he doubted that Plaintiff was in the mild mental retardation range as the scores indicated. (*Id.*) Yet, Dr. Reed also expressed that the scores were an accurate representation of Plaintiff's abilities because of his history of special education, frequent school changes, and alcohol abuse, the latter of which could have impacted his cognitive functioning. (*Id.*) Dr. Reed also noted that Plaintiff's history of labor and home

health care jobs indicate that the WAIS-III probably underestimated his level of functioning; however, Plaintiff would need help managing funds because of low arithmetical abilities. (*Id.*) Dr. Reed diagnosed alcohol abuse by history, probable mild mental retardation, and dysthymia. (R. at 165.)

After an unfavorable decision by A.L.J. Smith, Plaintiff continued to seek medical treatment. A medical imaging report from February 28, 2000 revealed "sclerosis and irregularity at [a] pseudoarticulation which could be the origin of patient's discomfort." (R. at 193.) The report also noted normal alignment and no detection of definite pars defects. (*Id.*) Plaintiff had a mental health consultation at PHS on April 4, 2000. (R. at 197.) The attending psychologist administered the Ravens Progressive Matrices, a non-verbal screening test, and reported a score in the very low range, "equivalent to Dr. Reed's test results." (*Id.*) Based on this test and the rest of the consultation, the psychologist wrote that she basically agreed with Dr. Reed's assessment that Plaintiff had mild mental retardation, and determined that Plaintiff was developing mild depression associated with his chronic back pain and inability to work. (*Id.*)

Plaintiff again declined physical therapy after a PHS doctor recommended it at a November 13, 2001 appointment for chronic low back pain. (R. at 400.) Plaintiff said physical therapy caused him too much pain. (*Id.*) In July of 2002, a University of New Mexico Hospital ("UNMH") consultation returned an abnormal study of both of Plaintiff's wrists consistent with bilateral carpal tunnel syndrome of moderate severity, with the left wrist in slightly worse condition than the right wrist. (R. at 373.) The physician noted that, "[g]iven the chronicity of the symptoms, carpal tunnel release may be necessary, other options include rest, splinting, [and] anti-inflammatories." (*Id.*) Dr. Petrakis of PHS "encouraged [Plaintiff] to wear [wrist splints]

13

much of the time." (R. at 432.) An August 8, 2002 radiology report from UNMH was completed due to Plaintiff's history of right lower quadrant pain. (R. at 374.) The radiologist noted no problems and deemed it a normal study. (*Id.*) In December of 2002, Dr. Petrakis wrote a letter stating that because Plaintiff's chronic back pain had "not responded very well to therapy, medications, or other treatments" and had not improved for eight years, it appeared to be "a permanent situation." (R. at 429.)

In preparation for his rehearing, Plaintiff underwent two more consultative evaluations in 2003. In April, he saw G.T. Davis, M.D. (R. at 433-41.) Dr. Davis said that Plaintiff had a large, muscular frame, walked with a slow gait, and although he could take steps on his toes, heels, and squat down, he seemed to have a little bit of discomfort while moving. (R. at 434.) Plaintiff exhibited good mobility in his upper back and neck with no complaints of pain. (*Id.*) He had bilateral paralumbar muscle tightness, forward bending at 40 degrees, extension at 5 degrees, and side bending of 10 degrees. (*Id.*) "With the seated straight leg raising maneuver, he reported some pulling pain in the lower back when his legs were straightened out" but did not complain of any pain radiating into his legs. (*Id.*) Dr. Davis found good motion in Plaintiff's shoulders, elbows, wrists, fingers, hips, knees, and ankles, and no sensory deficits, loss of sensation, nor intrinsic muscle wasting in his hands. (*Id.*) Plaintiff's "[d]eep tendon reflexes were 1+, motor and sensory functions were intact[,] his handgrip and pinch strength were strong, and "Tinel's test at the wrist was negative." (*Id.*) Dr. Davis recommended that Plaintiff look into surgery for his carpal tunnel syndrome, and stated that Plaintiff should "avoid repetitive and heavy lifting of over 30 pounds or so" and may be limited with respect to repetitively handling objects. (R. at 435.) Due to Plaintiff's problems with sitting, Dr. Davis also said "it may be reasonable to change

14

position every hour or so to stretch and move about." (*Id.*) Otherwise, Dr. Davis did not find any reason for other limitations. (*Id.*)

Plaintiff also had x-rays of his spine, right hip, and both wrists on April 21, 2003. (R. at 440-41.) Based on the x-ray of Plaintiff's thoracolumbar spine, the radiologist found no compression fractures, disc space narrowing, nor lytic or blastic lesions. (R. at 440.) The pedicles were intact and the radiologist concluded that Plaintiff had a congenital "transitional lumbrosacral junction with lubarization and an assimilation joint on the right side between the first and second sacral segments." (*Id.*) The appearance of Plaintiff's right hip and left wrist were normal. (R. at 440-41.) Plaintiff had a "nonunion of a prior fracture through the navicular bone, and [an] ossific fragment between the radial styloid and the subadjacent navicular." (R. at 440.) The conclusion stated that the fracture was "probably old with degenerative changes at the radiocarpal joint in the region of the navicular." (R. at 441.)

Michael Rodriguez, Ph.D. evaluated Plaintiff in a May 1, 2003 psychological consult. (R. at 442-51.) Plaintiff reported a history of alcohol and inhalant abuse and complained of memory problems. (R. at 443-44.) Dr. Rodriguez described him as cooperative with somewhat of a flat affect, affable, and as having tight associations with no evidence of a thought disorder. (R. at 446.) Plaintiff received an overall score of 20 on the Mini-Mental Status Examination; this placed "him in the 'severe' ranges, indicative of either organic brain syndrome or other major problem." (*Id.*) Plaintiff had an IQ equivalent to 72 according to the Test of Nonverbal Intelligence ("TONI-3"), which "placed him in the borderline range of intellectual functioning and at a percentile rank of 3." (*Id.*) Dr. Rodriguez also administered the Wide Range Achievement Test-3 ("WRAT-3"), on which Plaintiff "performed at a standard score of 63 in Reading, 54 in Spelling,

15

and 56 in Arithmetic.  When compared to his IQ of 72 on the TONI-3, results suggest only that he suffers from a spelling and an arithmetic disorder." (*Id.*)  Plaintiff's scores on the WRAT-3 showed him as functioning between the second and third grade level, and all scores were at or below the first percentile.  (*Id.*)

Dr. Rodriguez commented that Plaintiff had remarkable difficulties with attention and concentration, and diagnosed Plaintiff with a substance related disorder, borderline intellectual functioning, mathematics and written expression disorders, and assessed his Global Assessment of Functioning ("GAF") at 50.  (R. at 446-47.)  Dr. Rodriguez concluded that Plaintiff would have slight difficulties with understanding, remembering, and carrying out short, simple instructions; moderate difficulties with the ability to make judgments on simple work-related decisions, and marked difficulties with understanding, remembering, and carrying out detailed instructions.  (R. at 448.)  He also stated that Plaintiff would have moderate restrictions with appropriate interactions with the public, supervisors, and co-workers, and with responding appropriately to normal work pressure and changes in routine work settings.  (R. at 449.)

**IV.    DISCUSSION**

In his Memorandum in Support of Motion to Reverse and Remand, Plaintiff raises a number of issues in arguing that the A.L.J.'s decision was erroneous.  (Doc. 12.)  Plaintiff contends that the A.L.J. did not provide a legally sufficient Listing § 12.05(C) analysis, that the A.L.J. erred by relying on the Vocational Expert's testimony, and that the A.L.J.'s credibility finding was contrary to the evidence and the law.  Because I find that the case should be remanded for further development of the § 12.05(C) analysis, Plaintiff's second and third arguments do not need to be addressed in this opinion.

16

Plaintiff contends that the A.L.J. erred by inadequately analyzing whether Plaintiff's condition meets or equals Listing § 12.05(C) and by discounting the IQ scores reported by Dr. Reed in 1999.  (Doc. 12 at 4.)  Listing § 12.05(C) requires Plaintiff to meet two prongs by showing that he has (1) a valid verbal, performance, or full scale IQ anywhere from 60 to 69; and (2) another physical or mental impairment that significantly limits work functions.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).  In the first prong of the § 12.05(C) analysis, "the ALJ may discount an IQ score as invalid for a variety of reasons, so long as there is substantial evidence in the record to support his conclusion."  *McKown v. Shalala*, No. 93-7000, 1993 WL 335788, at *3 (10th Cir. Aug. 26, 1993) (citations omitted).  The Secretary's "regulations do not limit the question of validity to test results alone in isolation from other factors[,]" but allow the A.L.J. to examine "'[i]nformation from both medical and nonmedical sources . . . to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress).'"  *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991) (quoting 20 C.F.R. Pt. [220], § 12.00(D)), *cited in Hinkle v. Apfel*, 132 F.3d 1349, 1351 n.3 (10th Cir. 1997).  Here, the A.L.J. articulated three reasons for invalidating Plaintiff's 1999 IQ scores.  (R. at 248-50.)

The first two reasons, while not being noted as such in the decision, appear to involve the "daily activities" and "concentration, persistence, and pace" factors from the Regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1), (3).  A.L.J. Cole noted that Plaintiff spent much of his time watching television or reading, and also spent time helping his children with their homework.  (R. at 250.)  What he did not mention was Plaintiff's own testimony that he tried to help his children with their homework but "can't really do as much."  (R. at 266, 293.)  Attempts

17

at helping two young children with simple homework are not necessarily grounds for invalidating IQ scores. The A.L.J. also stated that "[t]he fact the claimant can read the newspaper shows that he is able to read rather detailed information." (*Id.*) This may very well be a valid reason to discount IQ scores, and should be considered further along with other facts found in the record that would shed light on each of the areas enumerated in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1)-(4).

The third and most significant reason the A.L.J. appeared to rely on to discount the 1999 IQ scores was because Dr. Reed was "inconsistent" and expressed doubts about Plaintiff's test results; therefore, the A.L.J. did not give Dr. Reed's report significant weight. (R. at 249.) It is true that an IQ score may be invalidated where it has "been undermined by its own administrator." *Schuler v. Comm'r of Soc. Sec.*, 109 Fed. Appx. 97, 101 (6th Cir. 2004). In this case, however, the psychologist's discussion of Plaintiff's history of special education classes and alcohol abuse, coupled with his diagnosis of mild mental retardation, suggest that Dr. Reed ultimately accepted the results of the test. (R. at 164-65.) Additionally, while Dr. Reed opined that Plaintiff may actually function at a higher level than his IQ would indicate (R. at 164), he "did not state that the results were invalid." *See Trujillo-Aguilar v. Barnhart*, No. 02-CV-0803 mem. op. at 20 (D.N.M. Apr. 8, 2003).

The IQ score A.L.J. Cole rejected was obtained using the WAIS-III, a test recommended by the Regulations as "useful in establishing mental retardation." 20 C.F.R. Pt. 220, App. 1 § 12.00(D). The Regulations prefer "IQ measures that are wide in scope and include items that test both verbal and performance abilities." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(d). But "in special circumstances, such as the assessment of individuals with sensory, motor, or

communication abnormalities, or those whose culture and background are not principally English-speaking, measures such as the . . . TONI-3 . . . may be used." *Id.* The IQ score the A.L.J. relied on came from the TONI-3. (R. at 442.) Scores from different intelligence tests "do not always reflect a similar degree of intellectual functioning." 20 C.F.R. Pt. 220, App. 1 § 12.00(D). For example, a score of 69 or below that would meet § 12.05(C)'s first prong is "characteristic of approximately the lowest 2 percent of the general population." *Id.* The Regulations require that scores from different tests be converted "to the corresponding percentile rank in the general population in order to determine the actual degree of impairment reflected by those IQ scores." *Id.* Dr. Rodriguez noted that Plaintiff's score on the TONI-3, a 72, put him "at a percentile rank of 3"; however, he did not explain if that calculation comported with the guidelines set forth in the Regulations. (R. at 446.) On remand, the A.L.J. should further develop the reasons behind invalidating the 1999 score, determine if the TONI-3 score definitely places Plaintiff outside the mild mental retardation range, and decide if a nonverbal test is even sufficient to determine Plaintiff's IQ for purposes of § 12.05(C) since Plaintiff is obviously capable of taking the WAIS-III.[9] It may also be helpful to discuss the other test Dr. Rodriguez performed, the WRAT-3, the scores on which placed Plaintiff at or "below the first percentile in all assessed areas." (R. at 446.)

---

[9] The A.L.J. may find it beneficial to his decision to have a psychologist test for or examine previous tests for evidence of malingering. *See generally Case Law Developments*, 29 MENTAL & PHYSICAL DISABILITY L. REP. 16, 27 (2005) (discussing case in which ALJ invalidated IQ score placing applicant in mild mental retardation range because Computerized Assessment of Response Bias test showed malingering); *Case Law Developments*, 28 MENTAL & PHYSICAL DISABILITY L. REP. 822, 858 (2004) (discussing case in which court denied application because applicant, who claimed he had mental retardation, had not taken MMPI-II or similar test to prove that he was not malingering).

The A.L.J.'s decision must be based on substantial evidence. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). I can evaluate his conclusions "based solely on the reasons stated in the decision." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (citation omitted). While there may be substantial evidence in the record to support A.L.J. Cole's decision to invalidate the 1999 IQ scores and rely instead on the higher 2003 IQ score, I am not at liberty to supply possible reasons the A.L.J. considered in giving less weight to the 1999 scores. *Id.* at 1084-85.

## V. CONCLUSION

In accordance with the standard of limited review, this Court has determined that Plaintiff's first argument is persuasive and this case must be remanded to the Commissioner for further proceedings, in accordance with this Memorandum Opinion and Order.

WHEREFORE, IT IS HEREBY ORDERED that Plaintiff's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing (Doc. 11) is **GRANTED** and this case is REMANDED to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order. A final order will be entered concurrently with this Memorandum Opinion and Order. IT IS SO ORDERED.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**